James W. SIKES and Felix Kemp, Individually and on Behalf of All Other Persons Similarly Situated, Plaintiffs,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY, Defendant.

No. CV 692–147.

United States District Court, S.D. Georgia, Statesboro Division.

March 26, 1998.

John Chapman Bell, Jr., Pamela Sue James, Bell & James, Augusta, GA, John B. Long, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, Melvyn I. Weiss, Michael Champlin Spencer, Ralph M. Stone, Richard Henry Weiss, Milberg Weiss Bershad Hynes & Lerach, New York City, William Allen Pannell, William A. Pannell, P.C., Alpharetta, GA, for James W. Sikes.

John Chapman Bell, Jr., Pamela Sue James, Bell & James, Augusta, GA, Charles B. Merrill, Jr., Merrill, Stone & Parks, Swainsboro, GA, Melvyn I. Weiss, Michael Champlin Spencer, Ralph M. Stone, Richard Henry Weiss, Milberg Weiss Bershad Hynes & Lerach, New York City, for Felix Kemp.

Ted Hamby Clarkson, Wyckliffe Austin Knox, Jr., Robert Perry Sentell, III, Joseph Hixon Huff, Kilpatrick Stockton, L.L.P., Augusta, GA, William N. Withrow, Jr., Susan S.

Lanigan, C. LeeAnn McCurry, Troutman & Sanders, Atlanta, GA, for American Telephone & Telegraph Company.

Bernard David Walter, Law Offices of Bernard David Walter, Dallas, PA, for Teleline, Inc.

### ORDER

BOWEN, Chief Judge.

Several matters are pending before the Court in the above-captioned case. (1) Plaintiffs' Motion for Partial Summary Judgment; (2) Defendant's "Objections and Request to Strike Plaintiffs' Unsupported Factual Contentions and Inadmissible Evidence" (Request to Strike);[1] (3) Defendant's Cross-Motion for Partial Summary Judgment; and (4) Defendant's Motion to Decertify Class. For the reasons stated below, Defendant's Motion to Decertify Class is **DENIED**, and both parties' summary judgment motions are **DENIED**. Defendant's Request to Strike is **DENIED** as moot.

### I. BACKGROUND

Plaintiff James Sikes is the parent of a young child who repeatedly called the 900-number "Let's Make A Deal" (LMAD) game, incurring charges in excess of $500.00 through approximately forty-eight calls on his parents' phone bill. Plaintiff Felix Kemp's grandson also placed a number of calls (for which the Kemps paid) to the LMAD game. This automated interactive telephone game was modeled on the television game show of the same name. The game had up to six levels, and at each level the caller could win a prize by selecting the correct "door" behind which the prize was concealed. Upon winning a prize, the caller could either accept that prize or advance to the next level. If the caller chose to advance, any previously awarded prize was forfeited in exchange for a chance at a larger prize. Plaintiffs claim that the odds of ultimately winning the maximum $2,000.00 cash prize were 1 in 2,700.

Plaintiffs contend that callers were enticed to play the LMAD game in various ways, including television commercials that featured Santa Claus and/or game-show host Monty Hall. These celebrities announced that they were "giving away $2,000.00 in cash instantly" but did not disclose the slim chances of actually winning that prize. When a call was placed to one of the applicable 900 numbers, the call was answered by a computer answering device. Callers were charged various rates for these calls,[2] and Plaintiffs allege that the LMAD game was structured in order to prolong each call.

The LMAD game was created by Teleline, Inc., of Beverly Hills, California. Defendant American Telephone and Telegraph Company (AT & T) provided 900 numbers and billing and collection services for the LMAD game pursuant to an agreement with Teleline.[3] Plaintiffs also allege that AT & T operated the answering machines that were used to play the LMAD game, and they further contend that AT & T approved the game in advance, that it had full knowledge of the game's operation and content, and that it was actively involved in reviewing and modifying various aspects of the game.

Plaintiffs filed this class action lawsuit in November 1992, asserting claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 et seq., for alleged acts of mail fraud, wire fraud, and illegal gambling committed in the operation of the LMAD game. Plaintiffs also assert claims under the Communications Act of 1934, 47 U.S.C. § 201 et seq.; the Georgia Racketeer Influenced and Corrupt Organizations Act (Georgia RICO), O.C.G.A. § 16–14–

---

**1.** Defendant's Request to Strike was not filed and docketed as a separate motion, but rather was included in Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts and Conclusions of Law.

**2.** According to the Plaintiffs, the rate was $3.88 per minute when the game ceased operation in December 1992.

**3.** Plaintiffs originally named AT & T, Teleline, and USA Networks as Defendants in this action (the LMAD game was advertised on television commercials broadcast by USA Networks). However, Plaintiffs have since voluntarily dismissed their claims against Teleline, and they entered into a settlement agreement with USA Networks. Thus, AT & T is the sole remaining Defendant in this action.

1 *et seq.;* and various other Georgia laws. On May 13, 1994, a master class and a Georgia subclass were certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The master class is defined as follows:

> All natural persons who have been billed for telephone calls originating from their households made to the 900–number "Let's Make A Deal" game and have not received cash prizes exceeding such charges.

(Order of May 13, 1994 at 12). The Georgia subclass is similarly defined:

> All members of the class who have been charged for calls made from the State of Georgia to 900–860–4332 and/or other 900 prefix telephone numbers used to play "Let's Make A Deal."

(*Id.*).

Plaintiffs and Defendant have each filed a motion for partial summary judgment on Plaintiffs' federal RICO claims. In addition, Defendant has moved to decertify this action as a class action, contending that the Eleventh Circuit's decision in a related case, *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014 (11th Cir.1996), requires decertification of the present case. I first will consider Defendant's motion for decertification, and I then will address the parties' summary judgment motions.

## II. MOTION TO DECERTIFY CLASS

In *Andrews v. American Tel. & Tel. Co.*, the Eleventh Circuit held that manageability problems precluded Rule 23(b)(3) certification in two cases[4] which are both related to the instant case. *See Andrews*, 95 F.3d at 1018. Defendant argues that the Eleventh Circuit's decision in *Andrews* compels decertification of this case for three reasons. First, Defendant argues that under *Andrews* Plaintiffs' RICO claims predicated on mail and wire fraud are inappropriate for class treatment because they require individualized showings of reliance, injury, and damages. Second, Defendant contends that Plaintiffs' RICO claims premised on illegal gambling are likewise precluded by the *Andrews* decision because they require an examination of the laws of all fifty states. Third, Defendant asserts that the *Andrews* court held that a class action is not a superior method of adjudicating RICO claims. I will address Defendant's arguments seriatim.

### A. *Mail and Wire Fraud Claims*

Plaintiffs allege in their Complaint that the Defendant engaged in multiple acts of mail and wire fraud in connection with the LMAD game, and that these acts constitute a pattern of racketeering activity for purposes of civil RICO liability. *See* 18 U.S.C. §§ 1961(1), 1962(c), 1964(c). In *Andrews,* however, the Eleventh Circuit declared that the mail and wire fraud claims asserted by the *Andrews* class were "not wholly subject to class-wide resolution." *Andrews,* 95 F.3d at 1023–24 (citing *Pelletier v. Zweifel,* 921 F.2d 1465, 1499–1500 (11th Cir.1991), and *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 328–29 (5th Cir.1978)). Similarly, the court stated with respect to the *Harper* class:

> Even if it could be shown that the appellants were engaged in a scheme to defraud and made misrepresentations to further that scheme, the plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages.

*Andrews,* 95 F.3d at 1025 (citing *Pelletier,* 921 F.2d at 1498–1500, and *Blue Bird Body Co.,* 573 F.2d at 327). Thus, Defendant argues that in this case the Plaintiffs' mail and wire fraud claims cannot be maintained as a class action because of the presence of the individualized issues of reliance, injury, and damages.

This argument, however, ignores the central difference between the *Andrews* and *Harper* cases and the present case: *Andrews* and *Harper* each involved numerous different 900–number programs, whereas this case involves only the LMAD game. The issues of individual reliance, injury, and damages did not, by themselves, preclude class certification in *Andrews* and *Harper;* rather, the

---

**4.** The *Andrews* opinion addressed the appeal of class certification orders issued in two related cases, *Andrews v. American Tel. & Tel. Co.,* Civil No. 191–175 (S.D.Ga. May 13, 1994) and *Harper v. American Tel. & Tel. Co.,* Civil No. 192–134 (S.D.Ga. May 13, 1994).

manageability problems became insurmountable only when combined with other factors. *See Andrews*, 95 F.3d at 1025 ("As in *Andrews*, the problems with trying the individualized elements of the [*Harper*] plaintiffs' claims, as well as handling the unique aspects of the 900–number programs, are compounded by the necessity of referencing fifty sets of credit card and consumer protection laws."); *id.* at 1027 (Barkett, J., dissenting in part) ("[T]he majority places too much emphasis on the number of different schemes involved [in *Andrews*], identifying this issue as the biggest one confounding class certification."). Indeed, as noted by the dissenting member of the panel, "[I]ssues of individual reliance do not generally preclude Rule 23(b)(3) certification, particularly in cases where a common course of deceptive conduct is alleged." *Id.* at 1026 (Barkett, J., dissenting in part).

I previously concluded that the individual issues of reliance, injury, and damages do not preclude class certification in this case, and the panel majority's opinion in *Andrews* does not alter that conclusion. As I explained in the class certification order, damages do not present a significant hurdle in this case because there is evidence readily available to establish how much each class member was billed, and computer programs can further simplify the necessary calculations. (Order of May 13, 1994 at 10–11). Moreover, I concluded that reliance could virtually be presumed under the facts of this case, as any caller who played the game and who was charged more than he or she won in prizes was necessarily injured "by reason of" the game. (*Id.* at 8–9); *see also Pelletier*, 921 F.2d at 1499 ("A civil RICO plaintiff must show ... that he was injured by reason of the defendant's acts of deception.").

Furthermore, I previously found that the game and its advertisements were fundamentally the same over the relevant time period. (Order of May 13, 1994 at 7–8). Thus, the Plaintiffs have basically alleged that the Defendant in this case "committed the same unlawful acts in the same method against the

entire class." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724 (11th Cir.1987) (quoting *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir.1983)). In this situation, "the mere presence of the factual issue of individual reliance [does] not render the claims unsuitable for class treatment." *Kirkpatrick*, 827 F.2d at 724–25; *cf. Blue Bird Body Co.*, 573 F.2d at 324 (noting that in price fixing case wherein a homogenous product was marketed in a similar manner nationwide, "once the illegal overcharge ... has been established, it is most reasonable to assume 'injury' or 'impact' upon a showing of proof of purchase").

█ In sum, I find that the Plaintiffs' mail and wire fraud claims do not present the same manageability problems identified by the Eleventh Circuit in *Andrews* and *Harper*. This case, unlike both of those cases, does not involve "hundreds of widely differing 900–number programs," *Andrews*, 95 F.3d at 1023, but rather involves only one game, the contours of which remained materially unchanged during the relevant time period. Thus, I am convinced that the issues of reliance, injury, and damages pertaining to the Plaintiffs' mail and wire fraud claims are not an obstacle to class certification under Rule 23(b)(3).

### B. *Illegal Gambling Claims*

Plaintiffs also allege that the LMAD game constituted an "illegal gambling business" under 18 U.S.C. § 1955, and that Defendant therefore engaged in the "collection of unlawful debt" for RICO purposes. *See* 18 U.S.C. §§ 1961(6), 1962(C), 1964(c). Defendant argues, however, that the Eleventh Circuit ruled in *Andrews* that the gambling claims asserted by the plaintiffs in that case[5] were not suitable for class treatment because they would have necessitated an examination of the laws of all fifty states. Thus, Defendant contends, the gambling claims in the instant case are also unsuitable for class treatment.

Contrary to Defendant's assertion, however, the Eleventh Circuit did not hold that the laws of all fifty states *must* be applied to

---

**5.** The plaintiffs in *Harper* did not assert RICO claims predicated upon illegal gambling. *See*

*Andrews*, 95 F.3d at 1021.

RICO gambling claims brought in a nation-wide class action. Indeed, the entire panel in *Andrews* seemed to implicitly accept the argument, advanced by the Plaintiffs in this case as well, that a gambling business violates RICO if it violates the gaming laws of any state in which the gambling business is conducted:

> The plaintiffs contend that only the gaming laws of Nebraska, [defendant] West Interactive's home state, need to be construed in order to assess the legality of the games of chance implicated in *Andrews,* because a gambling business is illegal under RICO if it is illegal under the laws of any state in which its affairs are conducted. But this contention assumes that Nebraska law prohibits each of the 900–number programs encompassed by the suit. If this assumption fails, each program that is legal in Nebraska will have to be assessed under each class member's home state law.

*Andrews,* 95 F.3d at 1024; *see also id.* at 1027 (Barkett, J., dissenting in part) ("As the majority recognizes, if the gambling schemes are illegal under the law of Nebraska, West Interactive's home state, then the schemes' illegality need not be examined under the laws of any other state.").[6]

Moreover, I previously found that even if the legality of the LMAD game must be assessed under the laws of various jurisdictions, the relevant inquiries would be manageable because they would share many common questions and because any individual state-law issues would not predominate over the common questions presented in this case. (Order of May 13, 1994 at 10). Although one member of the *Andrews* panel agreed with the similar findings I made in that case, *see Andrews,* 95 F.3d at 1027 (Barkett, J., dissenting in part), the majority expressed reservations concerning the manageability of undertaking inquiries into the laws of all fifty states absent a thorough analysis of the various state laws by the class proponents. *See id.* at 1024 (citing *Castano v. American Tobacco Co.,* 84 F.3d 734, 741–42 (5th Cir.1996),

for proposition that "[district] court cannot take class proponents' interpretations of law 'on faith' ").

Nevertheless, a close reading of the *Andrews* opinion reveals that the majority was more concerned with the number of programs at issue rather than the mere prospect of examining the gaming laws of all fifty states:

> With regard to the *Andrews* gambling claims, *the biggest problems* arise not so much in relation to the class plaintiffs' participation in the 900–number programs, *but with the contours of the programs themselves.* In assessing the gambling claims, *aspects of each 900–number program will have to be individually examined* to determine whether a particular program actually involves gambling or runs afoul of state gaming laws.

*Andrews,* 95 F.3d at 1024 (emphasis supplied); *see also id.* ("The [defendants] cite the need to interpret and apply the gaming laws of all fifty states to assess the legality of *each 900–number program* as foremost among the difficulties in trying the gambling claims on a class basis, and we agree.") (emphasis supplied). Thus, it was not simply the prospect examining fifty states' gaming laws, but rather the prospect of applying fifty states' gaming laws to hundreds of different 900–number programs, that rendered the *Andrews* gambling claims unsuitable for class treatment. *See id.* ("Scrutinizing hundreds of 900–number programs under the provisions of fifty jurisdictions complicates matters exponentially.").

■ The present case, by contrast, involves only one program—the LMAD game—the operational contours of which remained essentially the same during the relevant time period. The "biggest problems" identified by the Eleventh Circuit with respect to the *Andrews* gambling claims are not present in this case. Therefore, *Andrews* does not compel the conclusion that the Plaintiffs' RICO claims premised on ille-

---

**6.** I should emphasize, however, that the *Andrews* court did not expressly decide whether one state's laws may constitutionally be applied to all of the class plaintiffs' claims, as the court was not directly faced with that question. Further-more, the resolution of this issue is not essential to deciding whether the present class action must be decertified in light of *Andrews.* Thus, I will not address Defendant's choice-of-law arguments at this time.

gal gambling render this class action unmanageable.

### C. *Superiority of Class Action*

■ Finally, Defendant asserts that in *Andrews* the Eleventh Circuit held that a class action is not a superior method for adjudicating RICO claims because the statutory provisions for treble damages and attorneys' fees make even small individual claims feasible. Defendant's argument, however, overstates this aspect of the *Andrews* opinion. The court did not hold that a class action is an inferior method of adjudicating RICO claims; rather, the court simply expressed doubt as to whether a class action is the *only* feasible method for adjudicating these claims:

> [A]lthough the district court stated that class treatment may be the *"only* feasible method of adjudication, given the small size of each member's claims," . . . we note that even small individual claims under RICO *can be feasible* given the possibility of the award of treble damages and attorneys' fees to successful plaintiffs.

95 F.3d at 1025 (internal citation omitted) (second emphasis supplied). Thus, *Andrews* does not foreclose class treatment of Plaintiffs' RICO claims. Accordingly, Defendant's Motion for Decertification is **DENIED.**

### III. SUMMARY JUDGMENT MOTIONS

As previously mentioned, both the Plaintiffs and the Defendant have filed motions for partial summary judgment. Plaintiffs seek summary judgment on their federal RICO claims predicated on illegal gambling, and Defendant seeks summary judgment on all of the Plaintiffs' federal RICO claims.

### A. *Summary Judgment Standard*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Applicable substantive law determines which facts are material, that is, which facts have the potential to affect the outcome of the trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial ." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party ." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry its initial burden either by negating an essential element of the non-movant's case or by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Merely stating that the non-movant cannot meet its burden at trial is insufficient. *Id.*

If—and only if—the movant carries this initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608.[7] Again, this burden varies depending upon whether the movant or non-movant

---

[7] The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Rule 56 of the Federal Rules of Civil Procedure.

bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence sufficient to withstand a motion for directed verdict at trial. *Fitzpatrick,* 2 F.3d at 1116 (citation omitted). If the non-movant bears the burden of proof at trial, the non-movant's response must be tailored to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* If the movant demonstrated an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant, or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* (citation omitted).

The clerk has given the non-moving parties notice of the respective summary judgment motions, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

**B.  *Plaintiffs' Motion***

In order to fully understand the Plaintiffs' arguments for summary judgment, it is first necessary to examine their contentions with respect to the RICO gambling claims. Civil RICO liability may be imposed upon

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [who] conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. §§ 1962(c), 1964(c). An "unlawful debt" for RICO purposes is defined as

> a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, ... and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof.

18 U.S.C. § 1961(6). Under 18 U.S.C. § 1955, it is a federal felony to "conduct[ ], finance[ ], manage[ ], supervise[ ], direct[ ], or own[ ] all or part of an illegal gambling business." An "illegal gambling business" is defined as follows:

> (b) As used in this section—
>
> (1) "illegal gambling business" means a gambling business which—
>
> (i) is a violation of the law of a State or political subdivision in which it is conducted;
>
> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
>
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1). "Gambling" is broadly defined to include, but is not limited to, "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita, or numbers games, or selling chances therein." 18 U.S.C. § 1955(b)(2).

Plaintiffs argue that the LMAD game was conducted in California and that it violated California gaming laws.[8] Thus, they contend, the LMAD game was an "illegal gambling business" under § 1955, and any debts incurred in playing the game constituted "unlawful debts" within the meaning of § 1961(6). Therefore, Plaintiffs argue, Defendant is liable under § 1962(c) for collecting those unlawful debts.

**8.**  Plaintiffs also assert, with respect to the claims of the Georgia subclass, that the LMAD game was conducted in Georgia and violated Georgia gaming laws.

However, even assuming the Plaintiffs are correct that the debts incurred in playing the LMAD game were unlawful debts under the RICO statutes, summary judgment is inappropriate because the Plaintiffs have not fully addressed the other elements necessary for the imposition of civil RICO liability. In order to prevail on their RICO gambling claims, Plaintiffs must also prove, *inter alia*, (1) that there was a RICO enterprise; (2) that the enterprise's activities affected interstate or foreign commerce; (3) that Defendant was employed by or associated with the enterprise; (4) that Defendant participated, either directly or indirectly, in the conduct of the enterprise's affairs; and (5) that Defendant participated through the collection of unlawful debt. *See* 18 U.S.C. § 1962(c); *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir.1995), *cert. denied*, 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996); *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985). Plaintiffs have not made an affirmative showing that no reasonable jury could find for Defendant on these essential elements of their RICO gambling claims. *See Fitzpatrick*, 2 F.3d at 1115 (describing summary judgment burden when movant bears burden of proof). Accordingly, Plaintiffs' Motion for Partial Summary Judgment is **DENIED.** As Plaintiffs' summary judgment motion has been denied, Defendant's Request to Strike is **DENIED** as moot.

## C. Defendant's Motion

Defendant has also moved for summary judgment on the Plaintiffs' federal RICO claims. Defendant contends that the Plaintiffs cannot prevail on these claims as a matter of law because they cannot establish several of the elements necessary for civil RICO liability. Specifically, Defendant argues that Plaintiffs cannot prove the existence of a RICO enterprise and, even assuming the existence of such an enterprise, Plaintiffs cannot show that the Defendant participated in the conduct of the enterprise's affairs within the meaning of 18 U.S.C. § 1962(c). Furthermore, Defendant claims that the Plaintiffs cannot show a legally compensable RICO injury because some class members either received refunds or did not

pay the charges billed for calling the LMAD 900 numbers. Finally, Defendant contends that Plaintiffs cannot prevail on their RICO gambling claims because Defendant was not in the business of gambling.

### 1. Existence of a RICO Enterprise

Under 18 U.S.C. § 1961(4), a RICO "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Defendant makes two arguments that this definition is not met in this case. First, Defendant argues that the LMAD game cannot constitute a legally cognizable RICO enterprise because it is only a technology. In support of this argument, Defendant refers to several cases which hold that a RICO enterprise must be an association of natural persons or legal entities rather than merely a collection of inanimate objects or a technology. *See, e.g., Guidry v. Bank of LaPlace*, 954 F.2d 278, 282–83 (5th Cir.1992) (holding that bank account cannot constitute RICO enterprise); *Creed Taylor, Inc. v. CBS, Inc.*, 718 F.Supp. 1171, 1178 (S.D.N.Y. 1989) ("A RICO enterprise must be an association of natural persons or legal entities. It cannot be a collection of inanimate objects or a technology."). This argument, however, misstates the nature of the enterprise alleged in this case. Plaintiffs do not argue that the LMAD game itself constituted an enterprise; rather, Plaintiffs contend that the enterprise was the association of Defendant, Teleline, and others for purposes of conducting the LMAD game. (*See* Amended Complaint ¶ 64). Thus, Plaintiffs have alleged a sufficient association-in-fact for RICO purposes. *See United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir.1986) ("[T]he term 'enterprise' as broadly defined by the statute embraces not only formally defined entities, but associations of entities.")

Defendant's second argument is more alluring, but it too is ultimately unpersuasive. In *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court emphasized that a RICO enterprise "is an entity separate and apart from the pattern of activity in which it en-

gages," and that the existence of the enterprise is a separate element that must be proved in any RICO case. Defendant argues that the Plaintiffs in this case cannot show an enterprise that is distinct from the commission of the predicate acts themselves. In other words, Defendant argues that the only link between the members of the alleged enterprise are the predicate offenses of mail fraud, wire fraud, and illegal gambling allegedly committed in connection with the LMAD game. Thus, Defendant contends, Plaintiffs cannot show the existence of a separate and distinct RICO enterprise.

Plaintiffs, on the other hand, assert that no such showing is required in the Eleventh Circuit, citing *United States v. Cagnina,* 697 F.2d 915, 920–22 (11th Cir.1983). Plaintiffs' argument, however, is belied by both the Supreme Court's opinion in *Turkette* and Eleventh Circuit case law. *See Turkette,* 452 U.S. at 583, 101 S.Ct. 2524 ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."); *United States v. Bascaro,* 742 F.2d 1335, 1362 (11th Cir.1984) ("[T]he existence of an enterprise is an element of a RICO violation distinct from the element of a pattern of racketeering activity in which the enterprise engages."). Indeed, although the Eleventh Circuit indicated in *Cagnina* that proof of an "ascertainable structure" is not required in this circuit, *see Cagnina,* 697 F.2d at 921 (recognizing disagreement with Eighth Circuit), the court also recognized that under *Turkette* "both an enterprise and a pattern of racketeering activity must be shown." *Id.*

Defendant further contends that these separate elements require separate proof. That is, Defendant asserts that under *Turkette* the Plaintiffs cannot rely on the same evidence to establish both the existence of the RICO enterprise and the pattern of racketeering activity (or the collection of unlawful debt). Like the Plaintiffs' argument that a separate enterprise need not be shown, however, Defendant's argument that separate proof is required to establish the enterprise's existence is contradicted by the text of *Turkette. See* 452 U.S. at 583, 101 S.Ct. 2524 ("[T]he proof used to establish these separate ele-

ments [enterprise and pattern of racketeering activity] may in particular cases coalesce...."). Furthermore, in *Cagnina* the Eleventh Circuit "rejected the assertion that the Government must submit proof of an enterprise distinct from the evidence showing a pattern of racketeering." *Cagnina,* 697 F.2d at 921.

■ Thus, it is clear that while the Plaintiffs must show the existence of an enterprise which is distinct from the series of predicate acts alleged in this case, *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524, they may rely on the same evidence to show both the commission of the predicate acts and the existence of the enterprise. *Id.; see also Cagnina,* 697 F.2d at 921; *United States v. Mazzei,* 700 F.2d 85, 87–90 (2d Cir.1983); *United States v. Bagnariol,* 665 F.2d 877, 890–91 (9th Cir.1981). Furthermore, although Plaintiffs must present "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function[ed] as a continuing unit," *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524, they need not show that the enterprise had an ascertainable structure, *Cagnina,* 697 F.2d at 921, and the enterprise's existence may be proven by circumstantial evidence. *United States v. Elliott,* 571 F.2d 880, 898 (5th Cir.1978).

■ The enterprise alleged in this case is the association of Defendant, Teleline, and others for purposes of conducting the LMAD 900–number game. There is ample evidence in the record that the LMAD game was conducted by an ongoing organization and that the associates of this organization conducted the game on a continuing basis until the game ceased operation in December 1992. Thus, there is at least a genuine issue of fact with respect to the existence of this enterprise.

Nevertheless, Defendant insists that the Plaintiffs' evidence consists of nothing more than the minimal association surrounding the commission of the alleged predicate acts, which Defendant contends is insufficient to establish the existence of a separate and distinct enterprise. *See Stephens, Inc. v. Geldermann, Inc.,* 962 F.2d 808, 815 (8th Cir.1992) (citing *United States v. Bledsoe,* 674 F.2d 647, 664 (8th Cir.1982)); *Atlas Pile*

*Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 995–96 (8th Cir.1989). Even assuming this requirement is applicable in this circuit,[9] however, there is evidence that the association went beyond the minimal association surrounding the predicate acts. The predicate acts alleged by Plaintiffs are numerous acts of mail fraud and wire fraud—which allegedly constitute a pattern of racketeering activity—and collection of unlawful debt. Clearly, the operation of the LMAD game involved more than these alleged activities. In short, Plaintiffs appear to have alleged a sufficient RICO enterprise, and they have come forward with sufficient evidence to raise a genuine issue of fact concerning its existence.

### 2. *Participation in the Conduct of the Enterprise's Affairs*

In order to impose RICO liability under 18 U.S.C. § 1962(c), the Plaintiffs must show that the Defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." As the Eleventh Circuit has stated, § 1962(c) does not punish a defendant simply for engaging in racketeering activity or for collecting unlawful debt; rather, it punishes his "participation in the affairs of an enterprise through those means." *United States v. Pepe,* 747 F.2d 632, 661 n. 48 (11th Cir.1984). Defendant contends that the Plaintiffs cannot satisfy this element of their RICO claims for two reasons.

First, Defendant claims that Plaintiffs cannot show the requisite level of participation in the affairs of the enterprise. In *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held "that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' ... one must participate in the operation or management of the enterprise itself." Although "*some* part in directing the enterprise's affairs is required," *id.* at 179, 113 S.Ct. 1163, the Eleventh Circuit has stated that a RICO defendant "may be liable under the [*Reves* ] operation or management test by 'knowingly implementing decisions, as well as by making them.'" *Starrett,* 55 F.3d at 1548 (quoting *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994)).[10]

Defendant argues that it had no part in the operation or management of the LMAD game because it simply provided telecommunication, billing, and collection services to Teleline in connection with the LMAD game. Defendant analogizes these activities to professional services, which have been held insufficient by themselves to satisfy *Reves. See, e.g., University of Md. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3rd Cir. 1993); *Wiselman v. Oppenheimer & Co.,* 835 F.Supp. 1398, 1404 (M.D.Fla.1993). However, Plaintiffs contend that Defendant's participation in the LMAD enterprise extended beyond the provision of these services. For example, Plaintiffs contend that Defendant, *inter alia,* approved and edited the scripts and the advertising used in the LMAD game, reviewed and altered the prize structure and the rules of the game, and exercised control over the length and price of calls to the LMAD game.

Plaintiffs derive the bulk (though not all) of their evidentiary support for these assertions from the 1996 deposition testimony of Robert H. Lorsch, president of Teleline. Defendant argues that the Plaintiffs

---

**9.** The Eleventh Circuit noted in *Cagnina* that it takes a less restrictive view of the enterprise requirement than does the Eighth Circuit. *Cagnina,* 697 F.2d at 921; *see also* David Vitter, Comment, *The RICO Enterprise as Distinct from the Pattern of Racketeering Activity: Clarifying the Minority View,* 62 Tul.L.Rev. 1419, 1424–27 (1988) (noting that Eleventh Circuit is within majority view which "impose[s] no special requirement [beyond the two requirements identified in *Turkette* ] regarding distinctness between the enterprise and the pattern of racketeering activity").

**10.** *I note that there is an apparent split of authority concerning whether, under Reves, RICO liability extends only to those who have some part in the management or control of the enterprise or to all those who are within the enterprise's chain of command. Compare Starrett,* 55 F.3d at 1548, *and Oreto,* 37 F.3d at 750 (adopting chain-of-command test), *with United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994) (taking strict view of operation or management test). *See generally* Recent Case, 108 Harv.L.Rev. 1405 (1995) (analyzing *Oreto* and *Viola* ).

cannot rely on much of this testimony because it contradicts the deposition testimony given by Mr. Lorsch in 1993. It is true, as Defendant contends, that a party may not create a genuine issue of fact by relying upon an individual's sworn testimony that directly contradicts earlier testimony by that same individual. *See Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 658–59 (11th Cir. 1984); *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 893–95 (5th Cir.1980). However, I find that Mr. Lorsch's 1996 testimony is not so inherently inconsistent with his 1993 testimony as to constitute a sham. *See Kennett–Murray Corp.*, 622 F.2d at 894. Plaintiffs' evidence conceivably could support a finding that Defendant had a role in directing the affairs of the LMAD enterprise. Thus, there is a genuine issue of fact concerning whether Defendant participated in the operation or management of the LMAD enterprise within the meaning of *Reves.*

Second, Defendant argues that § 1962(c) requires Plaintiffs to establish some "nexus between the prohibited activity and the conduct of the enterprise's affairs." *United States v. Dennis*, 458 F.Supp. 197, 199 (E.D.Mo.1978) (quoting *United States v. Rubin*, 559 F.2d 975, 990 (5th Cir.1977)). Defendant contends that even assuming the Plaintiffs prove that Defendant engaged in the alleged predicate acts, their RICO claims must fail as a matter of law because Plaintiffs cannot show that Defendant participated in the conduct of the enterprise's affairs *through* those predicate acts. Although Defendant does not go into great detail with respect to this argument, its contention appears to be that the commission of the predicate acts themselves must also be the acts which constitute participation in the operation or management of the enterprise under *Reves.*[11]

Although I note that Defendant's argument is not entirely without support in the case law, *see University of Md.*, 996 F.2d at 1539 (holding that RICO defendant "must knowingly engage in '*directing* the enterprise's affairs' through a pattern of racketeering activity") (quoting *Reves*, 507 U.S. at 179, 113 S.Ct. 1163) (emphasis supplied by *University of Md.* court), it seems anomalous to require that the predicate acts necessary for RICO liability must also be the acts which are sufficient to subject the defendant to § 1962(c) liability under *Reves*. Indeed, the activities which will subject a defendant to RICO liability under § 1962(c)—a pattern of racketeering activity (*e.g.*, mail fraud, wire fraud, extortion, bribery, murder, etc.) or the collection of unlawful debt—are not the type of activities ordinarily involved in "*directing* [an] enterprise's affairs." *Reves*, 507 U.S. at 179, 113 S.Ct. 1163 (emphasis supplied).

The problem with Defendant's argument is that it merges two separate requirements for § 1962(c) liability: (1) the requirement that the defendant participate in the operation or management of the enterprise itself, *Reves*, 507 U.S. at 185, 113 S.Ct. 1163; and (2) the requirement that there be some relationship or connection between the predicate acts and the affairs of the enterprise. *See United States v. Carter*, 721 F.2d 1514, 1525–27 (11th Cir.1984). Shortly after the *Reves* decision, the Fourth Circuit noted the distinction between these two requirements:

> The issue in *Reves* is distinguishable from the issue in this case. *Reves* emphasized defining "conduct" and "participate" to determine *who* could be brought within RICO's ambit and decided that only those who manage or operate an enterprise are covered under RICO. In this case, however, we examine the connection required between the racketeering activity and an enterprise's affairs....

*United States v. Grubb*, 11 F.3d 426, 439 (4th Cir.1993) (emphasis supplied).[12] The nexus

---

11. For example, Defendant argues that "Plaintiffs' claims fail because they have not established the required nexus, *i.e.*, they *do not* prove that, through a pattern of racketeering or the collection of charges incurred for calls to the LMAD program, AT & T actually conducted the LMAD program." (Br. in Supp. of Def.'s Cross–Mot. for Partial Summ. J. at 9).

12. *See also Starrett*, 55 F.3d at 1541 ("To establish a violation of 18 U.S.C. § 1962(c), the government must prove: ... (4) that the defendants participated, directly or indirectly, in the conduct of the enterprise's affairs; and (5) that the defendants participated through a pattern of racketeering activity."); Christopher W. Madel, *The Modern RICO Enterprise: The Inoperation and Mismanagement of* Reves v. Ernst & Young, 71

requirement articulated in *Dennis,* the case relied upon by Defendant, refers to the second requirement mentioned above.

Indeed, a comparison with the *Dennis* case aptly illustrates the nature of the nexus requirement and why it is met in this case. In *Dennis,* the defendant was alleged to have been collecting debts from his coworkers while on the premises of his employer (General Motors Assembly Division), which debts purportedly arose from usurious loans made by the defendant. *Dennis,* 458 F.Supp. at 198. The court thus faced the question "whether the collection of unlawful debts by an employee from co-employees on the premises of an enterprise affecting interstate commerce constitutes participation in the enterprise's affairs through the collection of unlawful debts." *Id.* The court concluded that although there was a geographic nexus between the defendant's alleged activities and the enterprise (*i.e.,* because he was employed by the enterprise and collected the debts on its premises), there was no nexus between these alleged activities and the conduct of the enterprise. *Id.* at 199. The court accordingly dismissed the RICO indictment. *Id.*

▮▮ Here, by contrast, the predicate acts alleged to have been committed by the Defendant—mail fraud, wire fraud, and collection of unlawful debt—were allegedly committed in furtherance of the LMAD 900-number game. These activities have a clear and substantial nexus to the conduct of the LMAD enterprise alleged by the Plaintiffs. Thus, Defendant is not entitled to summary judgment on these grounds.[13]

### 3. *Compensable RICO Injury*

The Supreme Court has stated that a RICO plaintiff "can only recover to the extent that … he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275,

87 L.Ed.2d 346 (1985). Defendant notes that some class members either did not pay or received refunds for the charges billed to them for calling the LMAD game. Thus, Defendant contends, the Plaintiffs cannot show a compensable RICO injury and summary judgment should be granted in Defendant's favor on the Plaintiffs' RICO claims.

▮▮ It may well be true, as Defendant argues, that class members who did not pay or who received a refund may not maintain a RICO claim against Defendant. *See Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 612 (2d Cir.1994). This does not, however, entitle Defendant to summary judgment on the RICO claims of the entire class. Indeed, Defendant's argument seems to be more an attack upon the viability of this case as a class action rather than an argument for summary judgment. In any event, I have already concluded that this action should remain a class action. *See supra* Part II. Moreover, as I noted in the Class Certification Order, "It would be unjust to effectively deny a class of individuals an opportunity to assert their claims merely because the record-keeping of the defendants or their business associates did not anticipate eventual turbulence in the 900-number market." (Order of May 13, 1994 at 11).

### 4. *Collection of Unlawful Debt*

Finally, Defendant argues that it is entitled to summary judgment on the Plaintiffs' RICO gambling claims because Defendant did not engage in the "collection of unlawful debt." Defendant notes that the statutory definition of "unlawful debt" under 18 U.S.C. § 1961(6) has two prongs: (1) the debt must have been "incurred or contracted in gambling activity which was in violation" of federal or state law, and (2) the debt must have been "incurred in connection with the business of gambling in violation" of federal or state law. Defendant contends that Plaintiffs cannot satisfy the second prong of this

---

Tul.L.Rev. 1133, 1191–94 (1997) (explaining difference between these two requirements).

**13.** Defendant also asserts that it is entitled to summary judgment on the Plaintiffs' RICO claims predicated on mail and wire fraud because Plaintiffs have failed to address whether

Defendant "conducted the LMAD 900-number program 'through a pattern of racketeering activity.'" (Defendant's Consolidated Reply at 22). This argument fails, however, for the same reasons stated above.

definition because Defendant is not in the business of gambling, but rather is in the telecommunications business.

Defendant's argument is unpersuasive. Contrary to Defendant's assertions, the statute does not require proof that a RICO defendant is solely, or even primarily, engaged "in the business of gambling"; rather, by its plain terms the statute requires proof that the *debt* collected by the defendant "was incurred in connection with the business of gambling." 18 U.S.C. § 1961(6). Defendant cites several cases for the proposition that the two-pronged definition of § 1961(6) was established because Congress "sought to punish only large scale gambling operations involving 'organized crime' as contrasted with small time gambling." *United States v. Salinas*, 564 F.2d 688, 691 (5th Cir.1977). However, it is well established that the RICO statutes apply beyond the organized-crime context. *See, e.g., National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ("The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime.") (quoting *H.J. Inc. v. Northwestern Bell Tel., Co.*, 492 U.S. 229, 248, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).[14] Further-

more, *if* the LMAD game is determined to constitute illegal gambling under 18 U.S.C. § 1955, the extent of the game's operations would place it far beyond the ambit of the "small time gambling" meant to be excluded from the RICO statutes. Thus, Defendant has not shown that it is entitled to judgment as a matter of law on the Plaintiffs' RICO gambling claims.

In short, none of the arguments advanced by Defendant establish that summary judgment should be granted in its favor on all or a portion of the Plaintiffs' federal RICO claims. Accordingly, Defendant's Cross–Motion for Partial Summary Judgment is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment is **DENIED** and Defendant's Request to Strike is **DENIED** as moot. Defendant's Motion for Decertification and its Cross–Motion for Partial Summary Judgment are also **DENIED**. This case shall proceed to trial accordingly.

---

**14.** Indeed, since RICO's enactment in 1970 many attempts have been made—including some by this Judge—to persuade Congress to narrow, or at least clarify, the scope of civil RICO liability. With few exceptions, however, Congress has turned a deaf ear to these pleas, leaving the courts to wrestle with the deceptive simplicity of the statutory text.