**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sam CAGNINA, a/k/a "Sam", "Fat Man", "Charles Lawton",
Defendant-Appellant.**

**No. 81–5709.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 10, 1983.

---

Alan I. Karten, Miami, Fla., for defendant-appellant.

William C. Bryson, Joel Gershowitz, Washington, D.C., for plaintiff-appellee.

Before RONEY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

RONEY, Circuit Judge:

Sam Cagnina was convicted of a variety of crimes, including violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C.A. § 1962(c), (d). On appeal he claims (1) the Government failed to prove the "enterprise" element of a RICO offense, (2) misjoinder, (3) the district court erred in admitting declarations by unindicted co-conspirators, (4) the district court erred in denying his request for the Government to produce prior testimony of witnesses, and (5) consecutive sentences should not have been imposed for the RICO conspiracy and the substantive RICO offense. We affirm.

Cagnina was indicted with eleven others in 1978. Because he was not arrested until 1980, he was tried alone. The jury found Cagnina guilty of conspiracy to violate RICO, 18 U.S.C.A. § 1962(d); a substantive RICO offense, 18 U.S.C.A. § 1962(c); uttering counterfeit securities of the United States, 18 U.S.C.A. § 472; conspiracy to utter counterfeit securities, 18 U.S.C.A. § 371; possession of cocaine with intent to distribute, 21 U.S.C.A. § 841(a) and 18 U.S. C.A. § 2; truck hijacking, 18 U.S.C.A. § 659; and stealing property of the United States, 18 U.S.C.A. § 641. Cagnina was sentenced to a total of 45 years imprisonment with a subsequent special parole term of five years.

A brief review of some of the facts is helpful in evaluating Cagnina's contention that the Government failed to prove the existence of an "enterprise." In considering the facts, the evidence is viewed in the light most favorable to the jury verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The acts recited below were committed during the years 1971 to 1977. Much of the evidence was presented through the testimony of Cagnina's co-conspirators and colleagues in the criminal activity.

### A. Attempted Murder

Cagnina met Clyde Lee, who picked up lottery tickets and collected and paid bets for Harlan Blackburn, at a meeting arranged by Blackburn. Blackburn asked Lee to wait with Cagnina while he went home to retrieve $10,000 to pay for narcotics Cagnina had brought. After waiting for a while in Lee's car, Cagnina said he was leaving and began to drive away in his car when he stopped and shot at Lee. Several months later Cagnina and Pico Lopez, his partner in the drug business, asked Louis Llerandi to take a $10,000 contract to kill Lee. They said Lee was an informant and that Cagnina had shot at Lee but failed to kill him. The next month Llerandi shot Lee several times while Lee was in a phone booth near his home. Llerandi was paid only $5,000 because Lee did not die.

Two years later a Tampa police officer conducting an investigation of homicides perpetrated by Blackburn interviewed Cagnina. Cagnina denied committing any of the murders but claimed he would commit murder "if the price was right." He also stated that he associated with people who were willing to murder for money.

Later that year Llerandi offered Cagnina $10,000 to kill Lopez because Llerandi believed Lopez was responsible for beating and robbing his drug partner of two kilos of cocaine. Cagnina agreed to take care of it. Later Llerandi gave Cagnina $500 to buy a triggering device for a bomb, and a few days later a bomb in Lopez's car exploded. Lopez and a woman sitting in the car with him were thrown from the car, but neither was killed. Llerandi paid Cagnina $6,500.

### B. Extortion

Cagnina and Llerandi helped Donald Becker and George Webber, Miami massage parlor operators, to open a massage parlor in Tampa. They located a suitable building and, in meetings attended by Ronald Yaras, negotiated for weekly payment of money in exchange for "protection" against problems with local law enforcement. When the

Tampa police raided the massage parlor and Becker was forced to hire an attorney to reinstate the license, he protested the payments to Cagnina, who insisted that the payments continue.

### C. Arson

Cagnina and Llerandi introduced Becker to Terry Lee Garcia, who helped Becker open a massage parlor in Key West for Yaras. When the Key West business failed to make money, Yaras suggested to Llerandi that he contact Cagnina about burning it since it was insured. On Llerandi's recommendation Cagnina agreed to arrange with Junior Hernandez to burn the Key West massage parlor. Shortly thereafter it was burned.

Hernandez asked Jeffrey Moon to help him burn the Magic Fingers, a massage parlor in competition with Becker's and Webber's Tampa massage parlor. Hernandez told Moon he had unsuccessfully firebombed the Magic Fingers before. He assured Moon that they would be paid $1,500 for the job and that they could choose to be paid partially in drugs. Moon and Dwight Davis splashed gasoline inside the building, and it was ignited by the pilot light of a heater. Hernandez, Moon and Davis drove to Miami to collect payment from Cagnina, and received $100.

### D. Murder

Cagnina told Llerandi that Yaras had separated from his wife and that Yaras wanted to have her "beaten, raped, and shot up with dope." Cagnina also stated that this presented a good opportunity to kill Yaras. Shortly thereafter Cagnina informed Llerandi that he had Garcia kill Yaras, and that Llerandi had become "the protector of the massage parlors in Miami." The next day Garcia told Llerandi how he had shot Yaras.

George Webber disappeared, and after a few days Becker sought Cagnina's help in finding him. Several days later Cagnina summoned Becker to his house, threw him a set of keys, and told him he had a new partner. While Webber had been in Orlando preparing to open a new massage parlor, Garcia and two other men had driven him to a desolate place, shot him in the head, and driven the body to Miami. There Cagnina and Garcia put Webber's body in the trunk of the car and drove the car into a rock pit.

### E. Truck Hijacking

Hernandez told Albert Lyons he could make money hijacking trucks, and gave him the Miami telephone number of a man named "Sam" to be called after he and Richard Gatlin stole a truck loaded with groceries. Lyons and Gatlin stole a truck in Tampa, drove it to Miami, and called the telephone number. Cagnina and Garcia then met Lyons and Gatlin and led them to the Esmeralda Market. Lyons and Gatlin were paid $2,000 by Cagnina and $4,000 by Garcia. Cagnina instructed them to steal canned goods or meat in the future instead of the baked goods they had delivered and to deal directly with him rather than going through Hernandez.

Lyons and Gatlin next stole a truckload of beer in Tampa. When Cagnina could not be reached by telephone, they called Ramon Dorta, owner of the Esmeralda Market, as Cagnina had directed them. Because the baked goods had not sold well, Lyons and Gatlin received only $2,000 for the beer. The third load Lyons and Gatlin drove to Miami was pork, stolen from a wholesale distributor. Dorta refused to pay more than fifteen cents a pound even though Cagnina had told Lyons and Gatlin they would be paid fifty cents a pound for meat. Therefore, after unloading part of the load into a van procured by Dorta, they sold the remainder of the load to another market. Lyons and Gatlin stole a truck loaded with beef from a motel parking lot in Tampa. After driving it to Miami, they failed to reach either Cagnina or Dorta by telephone. Both Gatlin and Lyons were arrested, so no delivery was made.

Cagnina telephoned Hernandez and said he needed a load of eggs. At Hernandez's direction, Jeffrey Moon hijacked a truckload of eggs worth $1,385. The eggs were property of the United States government. Moon, Hernandez, and Davis drove the eggs

to Miami. On the way, Hernandez telephoned Cagnina, who told him to deliver the eggs to the Esmeralda market. Dorta paid Hernandez $1300 for the eggs.

### F. Narcotics

Alberto Porro carried a bowling bag into Cagnina's house and placed it in a closet. Later, he repacked the bag in Cagnina's presence. The bag contained a large glassine envelope of cocaine. Silvio LaPace purchased cocaine at Cagnina's house. On one occasion, Cagnina took cocaine to Charles Kabbaby's house, where it was used by Cagnina, Kabbaby, LaPace, Bobby Mix and others.

The following year, at Kabbaby's direction, Mix prepared a boat to go to South America to pick up marijuana. Cagnina told Mix that he would make sure Mix got paid for his work on the boat. The boat sank en route to South America. Later Kabbaby said that Cagnina was to pay Kabbaby $30,000 if the boat sank.

Cagnina told Mix that he had a quantity of marijuana he wanted to sell. Mix contacted a friend in Washington, D.C., who said he had friends who could sell it. The marijuana was transported to Washington in increments over a two or three week period. Twice a week, Cagnina went to Mix's house to pick up the proceeds from the marijuana sale. Cagnina sometimes delivered cocaine on these visits.

On another occasion, LaPace agreed to arrange the sale of a quantity of cocaine to James Harris, an undercover DEA agent. LaPace told Harris that two of his sources for cocaine were Cagnina and Kabbaby. Harris purchased four ounces of cocaine from Kabbaby for $5,600. A few days later, LaPace told Harris that Cagnina and Kabbaby were associates in the drug business, that LaPace had introduced them to each other, and that they were involved in the importation of cocaine and marijuana from Colombia. LaPace later sold Harris four ounces of cocaine, which LaPace said Kabbaby had supplied.

Agent Harris introduced LaPace to DEA undercover agent George Ellin, who claimed to be the financial backer of Harris'

drug operation. LaPace said he would have no problem supplying the cocaine Ellin needed. When LaPace failed to deliver several kilograms of cocaine to Ellin and Harris pursuant to an agreement, LaPace told Ellin that Kabbaby had had problems in delivering the cocaine.

LaPace later introduced Ellin to John Lombardozzi, who asked Ellin for $50,000 to finance a marijuana smuggling operation. Lombardozzi said he was stepping in on behalf of LaPace in the cocaine dealings, and that Cagnina would supply the cocaine. Later that day, Lombardozzi told Ellin that he had four bags of cocaine available immediately for $50,000 a bag. Lombardozzi said Cagnina would be present at the transaction, which was to take place that evening. The transaction was ultimately cancelled.

### G. Securities Fraud

Cagnina met with Richard Keats, who said he could convert counterfeit securities into cash. Cagnina said he had associates who could provide the "hot paper." Keats contacted Robert Heller, who owned a London bank, and told him that he would have a large amount of stolen securities to be converted into cash. He explained that original securities would be stolen from a brokerage house and replaced with counterfeits. When Cagnina was unable to obtain the securities, he and Keats decided to use $12 million in counterfeit Treasury Bills instead. Cagnina said he would inquire about getting a printer. Heller was to receive $2.5 million from the counterfeiting scheme, and Keats and Cagnina were to receive $2 million each. Cagnina introduced Keats to John Lombardozzi's brother, who agreed to provide the counterfeit bills for $500,000.

In the scheme devised by Keats, the bills were supposedly to be used as collateral for a loan to purchase property. Robert Goldstein was to be the purchaser. As far as Goldstein knew, the transaction was legitimate. Keats and Cagnina discussed the possibility of having Garcia kill Goldstein after the conclusion of the scheme. Keats, Heller, Goldstein, Lombardozzi and Cagnina

went to London, where Cagnina received the counterfeit bills and transferred them to Keats, who delivered them to Heller. Heller deposited the bills in an escrow account in a Swiss bank and received a negotiable receipt. According to plan, the receipt was to be presented to the bank as collateral for the loan. However, Heller later removed the Treasury Bills from the escrow account and took them to London to use in another deal. The bills were seized from him at Heathrow Airport and the scheme never reached fruition.

## I. *RICO Convictions*

Cagnina claims that the evidence was insufficient to support his RICO convictions because it failed to establish the existence of an "enterprise" within the meaning of the RICO statute.[1] He contends that a RICO "enterprise" must possess an "ascertainable structure" distinct from that inherent in the conduct of a pattern of racketeering activity, while the evidence here shows only "individuals associated together for sporadic crime."

Both the law and the facts of this case defeat Cagnina's argument. Although the Government must prove both an enterprise and a pattern of racketeering activity, it has done both in this case. As to the law, *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), which held that a RICO enterprise could be engaged solely in illegitimate activity, discounted the argument that such a holding would fuse the enterprise with the pattern of racketeering activity. The Court stated:

That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute [citation omitted]. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.

452 U.S. at 583, 101 S.Ct. at 2528.

This Circuit has interpreted "enterprise" to include an informal criminal network engaged in racketeering activity, such as the association of Cagnina and his colleagues. In *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), the Court held that a group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime could be convicted of a RICO offense, because they were associated for the pur-

---

1. 18 U.S.C.A. § 1962(c) provides:

   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

   18 U.S.C.A. § 1962(d) makes it unlawful for any person to conspire to violate § 1962(c). The statute provides that " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). A

   "pattern of racketeering activity" requires at least two acts of "racketeering activity" committed within ten years of each other. 18 U.S.C.A. § 1961(5). "Racketeering activity" includes three broad categories of crimes: (a) any of several specified "act[s] or threat[s] ... chargeable under State law and punishable by imprisonment for more than one year", including, as relevant here, murder, attempted murder, arson, extortion, and dealing in narcotics, (b) any act which is indictable under any of several specified sections of 18 U.S.C.A., including § 472 (uttering counterfeit securities) and § 659 (felonious theft from interstate shipment), and (c) federal offenses involving narcotics or other dangerous drugs.

pose of making money from repeated criminal activity. The Court stated that RICO reaches any group of individuals "whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes. . . . There is no distinction, for 'enterprise' purposes, between a duly formed corporation that elects officers and holds annual meetings and an amoeba-like infra-structure that controls a secret criminal network." 571 F.2d at 898. *Elliott* was consistently followed in this Circuit before the Supreme Court's decision in *Turkette. See, e.g., United States v. Sutherland,* 656 F.2d 1181, 1188–94 (5th Cir. 1981); *United States v. Martino,* 648 F.2d 367, 403 (5th Cir.1981); *United States v. Bright,* 630 F.2d 804, 830 (5th Cir.1980); *United States v. Diecidue,* 603 F.2d 535, 545 (5th Cir.1979). In *Diecidue,* defendants claimed that the indictment against them was insufficient because an enterprise must be an identifiable group with an existence separable from the pattern of racketeering activity. The Court, relying on *Elliott,* rejected their contention and stated that "nothing in the [RICO] Act or in the opinions by which this Court has interpreted it suggests that the enterprise must have been functioning and conducting operations in pursuit of a common goal prior to its involvement in racketeering activities." 603 F.2d at 545.

Contrary to Cagnina's argument, *Turkette* does not prevent this Court from adhering to *Elliott. Elliott* has been cited with approval in this Circuit after *Turkette. See, e.g., United States v. Kopituk,* 690 F.2d 1289, 1323 (11th Cir.1982); *United States v. Hartley,* 678 F.2d 961, 987–88 (11th Cir. 1982); *United States v. Thevis,* 665 F.2d 616, 625 (5th Cir.1982); *United States v. Phillips,* 664 F.2d 971, 1011–12 (5th Cir. 1981). *Turkette* did not suggest that the enterprise must have a distinct, formalized structure. Instead, the Supreme Court noted that the organization may be formal or informal. Although both an enterprise and a pattern of racketeering activity must be shown, the Court noted that the proof used to establish the two elements may in particular cases coalesce.

We recognize that the Eighth Circuit has held that a RICO enterprise must possess an "ascertainable structure" distinct from the association necessary to conduct a pattern of racketeering activity. *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982); *United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir.1982); *United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). In *Anderson,* the court expressly acknowledged that its position was contrary to *Elliott.* 626 F.2d at 1372.

Other courts have rejected the assertion that the Government must submit proof of an enterprise distinct from the evidence showing a pattern of racketeering. *See United States v. De Rosa,* 670 F.2d 889, 895–96 (9th Cir.1982) (evidence of a lengthy association between defendants, and payments for introduction to narcotics sources and for permission to distribute illegal drugs was sufficient to show enterprise); *United States v. Bagnariol,* 665 F.2d 877, 890–91 (9th Cir.1981) ("the government is not precluded from using the same evidence to establish the element of an enterprise and the element of a pattern of racketeering activity"); *United States v. Griffin,* 660 F.2d 996, 1000–01 (4th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982) (in upholding RICO convictions of gamblers who paid bribes to police officers, court required members to share "common purpose" for which they associated).

■ There was sufficient evidence in this case for the jury to find a RICO "enterprise" as that term has been interpreted in *Turkette* and *Elliott.* The evidence showed an informal association with the common purpose which united the defendants in *Elliott:* making money from repeated criminal activity. Its continuity is beyond dispute. The associates functioned as a continuing unit from 1971 to 1977, under the constant leadership of Cagnina. Although the enterprise grew in membership and its activities became more diverse, these facts

do not negate its existence. They testify to its success. "[A] single enterprise engaged in diversified activities fits comfortably within the proscriptions of the [RICO] statute and the dictates of common sense." *Elliott,* 571 F.2d at 899.

■ Although the evidence did not show that every member of the enterprise participated in or knew about all its activities, such evidence was not necessary to prove the existence of the enterprise. *Elliott,* 571 F.2d at 903–04. In any event, to the extent that some alleged participant in the enterprise was unaware of its broad scope, Cagnina is not aided. He oversaw and personally participated in all the illicit activities of the enterprise, including attempted murder, extortion, arson, murder, truck hijacking, narcotics sale and distribution, and securities fraud. There was overwhelming proof that Cagnina was intimately involved in the enterprise. *See United States v. Sperling,* 506 F.2d 1323, 1342 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975) (some defendants deeply involved in narcotics conspiracy and aware of its scope while others were not).

## II.   *Joinder of Non-RICO Counts*

Defendant's argument that the non-RICO counts against him were prejudicially misjoined depended on the invalidity of the RICO counts. Since we have affirmed the RICO convictions, this argument loses its substance.

## III.   *Admission of Co-conspirator Hearsay*

■ Defendant makes some contention that the district court improperly admitted the statements of sixteen of his alleged co-conspirators. This contention is frivolous, as demonstrated by the Government's brief, and needs no discussion. To admit the hearsay statements of co-conspirators, the trial judge must determine that evidence independent of the hearsay statements shows a conspiracy did exist, that the defendant and the declarant were members of the conspiracy, and that the statements were made during the course and in furtherance of the conspiracy. *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc),

*cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Co-conspirators' statements are admissible even when no conspiracy is charged if there is independent evidence of a concert of action in which the defendant was a participant. *United States v. Peacock,* 654 F.2d 339, 349–50 (5th Cir. 1981). There was sufficient evidence to support the district court's decision to admit the co-conspirators' statements.

## IV.   *Jencks Act Production of Testimony*

■ Defendant contends that the district court erred in denying his motions under the Jencks Act, 18 U.S.C.A. § 3500, to compel the Government to produce transcripts of prior testimony by two prosecution witnesses. He claims that the Government should have been compelled to produce Jeffrey Moon's testimony at a previous State of Florida prosecution of Junior Hernandez, and the testimony of Elmer Taylor at a pre-trial suppression hearing held in 1973 in the United States District Court for the Middle District of Florida. Under the Jencks Act, the court, on motion of the defendant, must order the prosecution to produce any statement of a witness relating to the subject matter of his direct examination that is in the possession of the United States. 18 U.S.C.A. § 3500. A statement is "in the possession of the United States" for Jencks Act purposes if it is in the possession of a federal prosecutorial agency. *See United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir.1977). Moon's testimony in the state trial was in the possession of state, not federal authorities. The testimony of Taylor had apparently never been transcribed. In any event, no transcript was in the prosecutor's possession. Anything in control of a district court, such as the court reporter's notes, is not in the possession of the prosecutor and therefore does not fall within the requirements of the Jencks Act. *See United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); *United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir.1977). Because neither Moon's nor Taylor's testimony was in the

possession of the prosecutor and both could have been obtained by the defendant with reasonable diligence, the Government had no obligation to produce them. *See United States v. Campagnuolo,* 592 F.2d 852, 861 (5th Cir.1979).

### V. *Consecutive Sentences*

Cagnina was sentenced to 15 years imprisonment for the RICO conspiracy, and 15 years imprisonment for the substantive RICO offense, with the sentences to run consecutively.

 This Court has held that the double jeopardy clause of the Constitution does not prevent prosecution for both a RICO conspiracy and a substantive RICO offense. *United States v. Martino,* 648 F.2d 367, 382–83 (5th Cir.1981). *See United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980). Defendant does not argue otherwise.

Cagnina contends, however, that the two convictions merge, precluding the imposition of consecutive sentences. This issue was addressed in *United States v. Hawkins,* 516 F.Supp. 1204 (M.D.Ga.1981), which was affirmed by this Court with no published opinion at 671 F.2d 1383 (11th Cir.1982). *Hawkins* held that consecutive sentences may be imposed for the substantive RICO offense and conspiracy to commit RICO. We have found no other Fifth or Eleventh Circuit case on point. The district court decision in *Hawkins* was largely based on a Ninth Circuit case, *United States v. Rone,* 598 F.2d 564, 570–71 (9th Cir.1979), and was contrary to a Sixth Circuit decision, *United States v. Sutton,* 642 F.2d 1001, 1040 (6th Cir.1980) (en banc). This panel, however, is bound by the decision in *Hawkins,* even though it was a Local Rule 25 affirmance without opinion. In *United States v. Ellis,* 547 F.2d 863, 868 (5th Cir.1977), the Court held that an affirmance without a published opinion is binding precedent for panels of the court, subject only to en banc consideration. Fifth Circuit cases prior to October 1, 1981 are binding precedent in this Court. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc). Since there could have been no affirmance of the district court in *Hawkins* unless the Court clearly approved consecutive sentences in this situation, the law of this Circuit is clear. The district court could properly impose consecutive sentences for the convictions under 18 U.S.C.A. §§ 1962(c) and (d).

AFFIRMED.