[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14841

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CHRISTOPHER BRIAN COSIMANO,
a.k.a. Durty,
MICHAEL DOMINICK MENCHER,
a.k.a. Pumpkin,

Defendants-Appellants.

—————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cr-00234-MSS-SPF-1

—————————————

Before WILSON, BRANCH, and TJOFLAT, Circuit Judges.

PER CURIAM:

This is an appeal from two defendants following a brutal murder. Evidence at trial showed that Defendants-Appellants Christopher Cosimano and Michael Mencher conspired to kill a member of a rival motorcycle club and did so. After Cosimano, Mencher, and several of their associates followed the victim, Paul Anderson, for several miles on the highway, Cosimano brazenly shot him to death at a traffic light in broad daylight. Mencher was present at the murder scene and later told a confidential informant that he would have shot the victim if Cosimano had been unable to. The evidence also supported the jury's finding that the murder served to increase the Defendants' status in their motorcycle club, which was an enterprise engaged in interstate racketeering. Further, the evidence supported a separate conviction for the Defendants' use of a firearm during a violent crime. While the Defendants argue that murder is not categorically a crime of violence, our precedent holds the contrary. The Defendants raise several additional arguments on appeal, but none justify reversal. We thus affirm their convictions.

## I.    BACKGROUND

The Defendants were associated with the 69'ers Motorcycle Club, a national organization with active chapters in several states. Cosimano was president of the Hillsborough County Chapter (nicknamed the Killsborough Chapter), Sean Leonard was vice president, Erick Robinson was sergeant at arms, and Allan Guinto was treasurer.  Mencher and Cody James Wesling were "prospects," or prospective members.

In May 2018, a grand jury charged Cosimano, Mencher, Robinson, Guinto, and Wesling in a nine-count indictment.  A superseding indictment followed two months later.  Relevant to this appeal, Count 1 charged conspiracy to commit murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), Count 2 charged murder in aid of racketeering activity (VICAR murder), 18 U.S.C. §§ 1959(a)(1) and 2, and Count 3 charged the Defendants with knowingly using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.

A month later, a federal agent interrogated Cosimano. Leading up to the interrogation, Cosimano had been held on state murder charges and had spent months in solitary confinement. The agent told Cosimano at the outset that he had some paperwork to go over.  He then read Cosimano his *Miranda*[1] rights.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Cosimano confirmed that he understood his rights and signed the waiver form, agreeing to talk with the agent. The agent told Cosimano that he could not make "any promises" but that Cosimano had "an opportunity to help [himself,] [t]o put [himself] in the best possible position." "I'm going to give you a lot of credit and . . . a little [ ] grace," he told Cosimano.

For the next five hours, Cosimano spoke—often emotionally—about his experience with motorcycle clubs and drug dealing. He also discussed a fight in a Miami bar between the 69'ers and a rival gang, the Outlaws. At one point during the conversation, Cosimano asked the agent if it would "favor" him to "put all the information out." The agent replied "I don't know," and then added that honesty would "help [Cosimano] out." Cosimano later moved to suppress these statements. His waiver, he argued, was not voluntary, knowing, and intelligent because the agent had improperly downplayed the *Miranda* warnings. The district court denied the motion, finding that "the defendant was well-aware of what he was signing." Some portions of Cosimano's statements—those relating to the Outlaws and the Miami incident—later came in at trial.

Before trial, Mencher and Cosimano joined in a motion to dismiss filed by Wesling. The Defendants argued that the district court should dismiss the Count 3 charge for use of a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c). The predicate "crime of violence" for Count 3 was the VICAR murder charged in Count 2, which in turn was based on a violation of Florida's first-degree murder statute. The Defendants argued that the

predicate murder offense was not categorically a crime of violence because it did not necessarily involve the use of physical force. Florida first-degree murder, they posited, could be carried out non-violently by poisoning or leaving a person for dead. The court denied the motions.

As the case proceeded to trial, Cosimano and Mencher were the only remaining defendants. They moved to sever their trials, arguing that they planned to raise mutually antagonistic defenses. Specifically, both Defendants planned to point the finger at the other. "Spillover" effect also concerned the Defendants; they worried that the government would be able to introduce evidence in a joint trial that would be inadmissible if the trials were severed. But after the Defendants reached an agreement with the government about redacting certain statements to limit spillover effect, the court denied the motions to sever as moot. The court would later give a limiting instruction reminding the jury to consider each count and each defendant separately.

At trial, the government called Guinto and Wesling, who had taken plea agreements, as well as Leonard and a regional 69'ers boss, Art Siurano, who had agreed to cooperate with the government. The government also called a slew of other witnesses including another eye witness to the shooting. The following evidence was presented.

The 69'ers motorcycle club is a "one-percent" club, meaning its members are the "elite[s] of the outlaw biker world" and the one percent of society that "live by their own rules." The club has a

written constitution and an organizational hierarchy. Club members pay annual dues of $50 to the New York Chapter. And according to Siurano, northeast-based chapters of the 69'ers have coordinated with Florida-based chapters to distribute drugs.

Leading up to Anderson's murder, the Florida-based 69'ers were at odds with a rival motorcycle club, the Outlaws. To tell it briefly, the Outlaws considered Florida their territory. When some Outlaws, including Leonard, defected and joined Florida chapters of the 69'ers, the Outlaws were not pleased. Tensions soon boiled over. One night, when a St. Petersburg, Florida bar hosted a "Bike Night," Leonard and Guinto showed up to represent the 69'ers. The Outlaws were there too—and in greater numbers. Several of the Outlaws, including Pasco County President Paul Anderson, confronted Leonard and Guinto and demanded that they hand over their club vests—called "cuts" in the biker world—or die in them. When Leonard and Guinto refused to comply, the Outlaws attacked them, beat them badly, and stole their cuts.

About a week later, federal law enforcement arrested Leonard on a firearms charge in New York. He entered an agreement with the government and became a federal informant.

Meanwhile, animosity between the 69'ers and the Outlaws mounted. Cosimano wanted revenge against the Outlaws for the Bike Night incident. A national 69'ers boss also wanted retribution and said the "score would not be settled until two [Outlaws] go to the hospital and we have two of their cuts." As Siurano put it, the 69'ers and the Outlaws "were going to war."

One day in late July 2017, Cosimano called Guinto and said he was outside a St. Petersburg bar that the Outlaws frequented. Eventually, a prominent Outlaw came out of the bar and left on his motorcycle. It was James Costa, President of the St. Petersburg Outlaws. Minutes later Costa was shot on the highway. Guinto testified that Cosimano admitted to being the shooter later that night. According to Guinto, Cosimano gave him and Wesling clothes and a gun with instructions to get rid of them. Guinto testified that his assistance increased his stature in the club, and that the 69'ers expected the shooting to bolster their reputation.

Hostility between the clubs showed no sign of dissipating. Following the Bike Night incident, Cosimano had galvanized the Killsborough 69'ers to engage in "shows of force" to antagonize the Outlaws. In response, a contingent of Outlaws called the One Ton Crew, led by Anderson, had threatened to take more cuts from Killsborough Chapter members. Then, while Cosimano and a fellow 69'er were in Miami, they got in a bar fight with some Outlaws. In the melee, Cosimano allegedly hit one Outlaw with a plate and used a piece of broken plate to stab another.

This was the state of affairs on December 21, 2017, the day Anderson was murdered. Around midday, Guinto, Robinson, and Wesling were out having lunch when Cosimano called. He said he knew where an Outlaw was and told the group to meet him at the 69'ers' clubhouse. When they arrived, Cosimano and Mencher were "getting their bikes ready . . . [, ] gearing up for a ride." Wesling would later tell Leonard that, at this point, Cosimano said he

was going to murder Anderson. At trial, however, Wesling testified that Cosimano said he knew where Anderson was and wanted to "beat the shit out of him."

The group left to go after Anderson. Guinto and Robinson took one car, Wesling drove another, and Cosimano and Mencher took their motorcycles. Normally, Cosimano and Mencher wore their 69'er cuts when they rode. This time, they rode without their cuts, dressed in black, and covered their faces with bandanas. They also flipped their license plates, making them unidentifiable, and Cosimano removed the 69'ers stickers from his motorcycle.

At some point, the group caught up with Anderson, who was driving a pickup truck. They followed him for about a half hour. After Anderson passed through a toll booth off the Suncoast Parkway, he came to a stop at a red light. Guinto and Robinson had fallen behind, but Wesling was still on Anderson's tail. According to Wesling, Cosimano and Mencher then passed him on their motorcycles and pulled up close to Anderson's truck—Cosimano on the passenger side, Mencher 10 to 15 feet behind him. Cosimano dismounted his bike and knocked on Anderson's truck window. He then fired multiple gunshots into the truck, killing Anderson.

Besides Wesling, another driver on the road witnessed the shooting. Although he could not identify the Defendants, he testified about the motorcycles he saw. He said the motorcycle in front—the one that pulled up next to Anderson's truck—had saddlebags and a windshield. That description matched Cosimano's

motorcycle. And the motorcycle behind that one, the witness testified, had graphics of "SS lightning bolts." That description matched Mencher's motorcycle.

The 69'ers left the scene after the shooting. According to Guinto, they stopped when they got to a secluded area. Cosimano gave Robinson a handgun, helmets, and a sweater to dispose of. And Cosimano and Mencher changed into extra clothes they had brought with them. Wesling testified that he met Cosimano at a gas station a few hours later, and the two discussed the shooting. Cosimano told Wesling he had shot Anderson to protect Leonard.

As for Mencher, he had phone conversations with Leonard after the killing, not realizing that Leonard was a confidential informant and that law enforcement was recording the call. By this time, news stories had shown pictures of both Defendants' motorcycles, so the two discussed how they would hide or disguise the bikes. Cosimano, who was with Mencher, chimed in, telling Leonard that one of the motorcycles had already been "changed . . . up," while the other needed to be hidden. Later, when Mencher was by himself, he spoke again with Leonard, venting that Cosimano's plan to attack Anderson had been ill-conceived. "I don't mind doing things," Mencher said, "but not in broad daylight." Mencher also said that he would have shot Anderson from behind if Anderson had tried to get away. "I would've just opened up into the back of him, you know what I mean?"

At the close of the government's case in chief, the Defendants moved for judgment of acquittal. They argued in part that

there was insufficient evidence to establish an enterprise engaged in racketeering activity and that affected interstate commerce. They also argued that first-degree murder could not serve as the predicate crime of violence for the § 924(c) count. The court denied the motions. The jury began deliberating on the eighth day of trial.

An issue arose during deliberations. One of the jurors, Juror 3, did his own research on the law during a weekend break. When deliberations resumed, he discussed his research with the other jurors. The foreperson notified the court, after which the court interviewed each of the jurors individually. Juror 3 admitted what he had done. As for the other jurors, the court's inquiry established that some had trouble understanding Juror 3, whose first language was not English, and that most paid little attention to his explanation of the law. The jurors assured the court that they could decide the case based on the evidence and the law the court had given them. Having investigated, the district court decided to remove Juror 3 and replace him with an alternate juror. Cosimano agreed with this course of action, but Mencher moved for a mistrial. The district court denied Mencher's motion, replaced Juror 3, and had the jury "begin its deliberations anew."

The jury convicted Mencher and Cosimano on Counts 1–4 and acquitted them on other counts, some of which charged Cosimano for his alleged role in the Costa shooting and another of which charged Mencher with drug trafficking. The government dismissed Count 4 at sentencing, so the district court sentenced

Mencher and Cosimano only on Counts 1–3.  The court sentenced both Defendants to 10 years on Count 1 to run concurrently with a life sentence on Count 2.  On Count 3, Cosimano received a 10-year sentence, and Mencher a 5-year sentence, to run consecutively to the Count 1 and 2 sentences.  Both Defendants appealed.

## II.    DISCUSSION

Our discussion divides into three parts.  First, we address the Defendants' argument that the district court should have granted judgment of acquittal on Counts 1 and 2 for conspiracy to commit VICAR murder and VICAR murder.  Second, we address the Defendants' argument that their Count 3 conviction for committing a crime of violence with a firearm should be vacated because the predicate murder charge is not categorically a crime of violence.  Third, we address the Defendants' remaining arguments.  This third section divides into three subsections: (1) the Defendants' argument that the district court abused its discretion in denying their motion to sever the trial, (2) Cosimano's argument that his post-*Miranda* statements should have been suppressed; and (3) Mencher's argument that the district court abused its discretion in denying his motion for a new trial based on juror misconduct.

A.    *Sufficient Evidence Supported the Verdict on Counts 1 and 2*

We review the sufficiency of the evidence de novo, drawing all reasonable inferences in the government's favor.  *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005).  We must affirm

the convictions unless there is no reasonable construction of the evidence on which the jury could have found the Defendants guilty beyond a reasonable doubt. *Id.* at 1334.

On Counts 1 and 2, the government had to prove that Cosimano and Mencher conspired to murder Anderson, that they aided and abetted each other in murdering him, and that the Defendants committed those crimes for the purpose of "maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). An enterprise includes "any . . . group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." *Id.* § 1959(b)(2). "[R]acketeering activity" is defined as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year." *Id.* § 1961(1).

Mencher and Cosimano make three main arguments. First, they challenge the sufficiency of the evidence showing that they conspired to murder Anderson or aided and abetted his murder. Second, they argue that the 69'ers' Killsborough Chapter was not a racketeering enterprise engaged in interstate commerce. Third, they argue that the murder would not have served to maintain or increase their position with the 69'ers.

The Defendants' first argument relies heavily on testimony from Wesling, who was present at the scene of the murder.

Wesling testified that on the morning of the murder Cosimano had said that he wanted to "beat the shit out of Anderson." That testimony, the Defendants say, establishes that the plan was to beat up Anderson rather than kill him. They argue that the evidence, at most, showed that the murder was a "spur of the moment" decision. There was no evidence of any advance planning, they say. Yet the following facts allow an inference to the contrary:

- As the Defendants left the clubhouse to follow Anderson, they brought extra clothes with them, indicating a plan to hide their identity.

- They flipped their license plates to hide them and did not wear their 69'er cuts as they normally would on a motorcycle ride.

- The Defendants tracked Anderson for miles, and, according to witnesses, Cosimano shot Anderson through the window of his truck.

- After the killing, Mencher's remarks on a recorded call with a confidential informant supported an inference that he knew the plan was to kill Cosimano. Mencher even bragged that he would have killed Anderson if Cosimano was unable to.

Based on this evidence, a reasonable jury could conclude that the Defendants conspired to kill Anderson, and that they aided

and abetted each other in his murder.

The Defendants also contest the jury's finding that their local chapter of the 69'ers was an enterprise. Instead, they say, it was no more than a disorganized group of guys partying in a clubhouse. And even if it could be considered an enterprise, they argue, it was not a racketeering enterprise that affected interstate commerce. While some of the 69'ers sold drugs, the Defendants argue that drug dealing was separate from membership in the 69'ers.

We disagree. The definition of "enterprise" is broad. *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983). An enterprise may be a "loose or informal," even "amoeba-like" association. *Id.* That standard is easily met here. The 69'ers are a national motorcycle club that holds meetings, has a constitution, and requires members to pay dues. Members wear vests with a wolf on the center patch, and the club has used "shows of force" to assert their dominance over other motorcycle clubs. The Killsborough Chapter was part of that organization and held meetings on the first and third Thursdays of every month. Even if the group was not highly formalized, a jury could conclude that it was an association in fact and thus an enterprise under the statute. *See* 18 U.S.C. § 1959(b)(2).

And there was evidence that the 69'ers operated as a racketeering enterprise that affected interstate commerce. For example, Siurano testified that he sent drugs from New Jersey to Florida-based 69'ers, including Robinson, who then distributed the drugs. Drug trafficking is a type of racketeering. *Id.* § 1961(1). And it is enough to satisfy the government's burden that the enterprise—

not necessarily each individual—engaged in racketeering and conduct that affected interstate commerce. *See United States v. Norton*, 867 F.2d 1354, 1359 (11th Cir. 1989). The evidence thus supported the jury's finding on these elements.

The Defendants' final argument on sufficiency of the evidence is that the murder would not have served the purpose of maintaining or increasing their position in the 69'ers. Again, we disagree. The 69'ers' national leadership wanted to settle a score with the Outlaws, and there was evidence that Anderson's murder was meant to settle that score. A reasonable jury thus could have inferred that the murder served to increase or maintain the Defendants' status in the 69'ers organization.

### B.    *Florida First-Degree Murder Is a Crime of Violence*

Count 3 of the indictment charged the Defendants with violating 18 U.S.C. § 924(c)(1)(A), which makes it a crime to use, carry, or possess a firearm during a crime of violence. The predicate crime of violence charged was VICAR murder, 18 U.S.C. § 1959(a)(1), "as charged in Count Two" of the indictment. Count 2, in turn, charged VICAR murder based on a violation of Florida's first-degree murder statute, Fla. Stat. § 782.04(1)(a)1. The Defendants challenge their Count 3 convictions, arguing that the predicate murder offense was not a crime of violence.

"[W]e review de novo whether a prior conviction is a crime of violence under § 924(c)." *Steiner v. United States*, 940 F.3d 1282, 1288 (11th Cir. 2019) (per curiam). This analysis generally requires

a "categorical approach," in which we look only to the elements of the statute of conviction, not to the defendant's real-world conduct. *Mathis v. United States*, 579 U.S. 500, 504 (2016). When applying the categorical approach to § 924(c), we must ask whether the offense at issue "always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *United States v. Taylor*, 142 S. Ct. 2015, 2020 (2022). We alter our approach, however, when the statute of conviction is "divisible," meaning the statute lists multiple, alternative elements, effectively creating multiple crimes. *Mathis*, 579 U.S. at 505. When dealing with a divisible statute, we employ a "modified categorical approach" in which we consider "a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id.* at 505–06 (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)). We "then compare that crime, as the categorical approach commands, with the relevant generic offense." *Id.* at 506.

We recently held that the VICAR statute is divisible. *Alvarado Linares v. United States*, No. 19-14994, --- F.4th ----, 2022 WL 3367950, at *4 (11th Cir. Aug. 16, 2022). The statute prohibits a number of offenses committed in aid of racketeering, including murder, maiming, assault, and threats "to commit a crime of violence against any individual in violation of the laws of any State or the United States." *Id.* (citing 18 U.S.C. § 1959(a)). "Because the statute lists multiple acts that each qualify as a crime, we apply the

modified categorical approach to determinate whether a VICAR offense is a 'crime of violence' under Section 924(c)(3)." *Id.*

A point of confusion in this case, however, has been which murder offense we look to for purposes of the modified categorical approach. Do we look through the VICAR statute to its state predicate offense and analyze whether Florida first-degree murder is a crime of violence? Or do we analyze whether a generic federal definition of murder is categorically a crime of violence?

Our recent decision in *Alvarado Linares* resolves this dilemma. We must look to how the government charged the VICAR offense, and when, as here, it incorporated the state law elements into the jury charge for the VICAR offense, then we must look to the state predicate offense, in this case Florida first-degree murder. *See id.* That statute prohibits "[t]he unlawful killing of a human being . . . [w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being." Fla. Stat. § 782.04(1)(a)1.

Under our precedents, Florida first-degree murder is a crime of violence. In the Armed Career Criminal Act (ACCA)[2] context, we've held that Florida attempted first-degree murder and Florida second-degree murder are crimes of violence. *See Hylor v. United States*, 896 F.3d 1219, 1223 (11th Cir. 2018); *United States v. Jones*, 906 F.3d 1325, 1329 (11th Cir. 2018). And in the § 924(c) context,

_____

[2] ACCA's elements clause is materially similar to that of § 924(c). *Hylor v. United States*, 896 F.3d 1219, 1225 (11th Cir. 2018) (Jill Pryor, J., concurring).

we've held the same as to Georgia malice murder and federal second-degree murder. *See Alvarado Linares*, 2022 WL 3367950, at *5 (Georgia malice murder, prohibiting the killing of another person with malice aforethought, "necessarily entails the use of physical force against the person of another.")[3]; *Thompson v. United States*, 924 F.3d 1153, 1158 (11th Cir. 2019) (Federal second-degree murder, prohibiting the killing of another person with malice aforethought, necessarily involves force "capable of causing physical pain or injury" thus satisfying § 924(c).). Naturally, then, the same is true of Florida first-degree murder in the context of § 924(c).

Resisting this conclusion, the Defendants argue that it is possible to commit Florida first-degree murder without physical force. They posit a few examples, like this one: "[A] defendant takes a boat far offshore with a victim who jumps off the boat to go swimming and the defendant later decides to drive the boat away and leave the victim stranded in the ocean to die." In this example, the Defendants say, the elements of Florida first-degree murder would be satisfied even though the offense did not involve physical force.

We've heard arguments like this before, and we've rejected them. Take our decision in *United States v. Sanchez*, 940 F.3d 526,

---

[3] We added that, to the extent it was relevant, generic federal murder also meets the definition of a crime of violence because it entails "the unlawful killing of a human being with malice aforethought." *Alvarado Linares v. United States*, No. 19-14994, --- F.4th ----, 2022 WL 3367950, at *6 (11th Cir. Aug. 16, 2022).

536 (11th Cir. 2019). There, the defendants argued that New York second-degree murder is not a violent felony for purposes of the ACCA because it can be committed nonviolently by, for example, starving a person to death. *Id.* at 535. Unpersuaded, we reasoned that "the intentional causation of bodily injury or death, even by indirect means such as withholding medical treatment or food, necessarily involves the use of physical force." *Id.* "[I]t is impossible," we held, "to cause bodily injury without force" and thus "impossible to cause death without force." *Id.* at 536. The Defendants' drowning example fails for the same reason. Subjecting a victim to death by drowning would involve the use of force, even if indirectly.

The bottom line: to commit Florida first-degree murder, a defendant must unlawfully kill another human with a premeditated design. Fla. Stat. § 782.04(1)(a)1. To do that, a defendant necessarily must use physical force. *See Sanchez*, 940 F.3d at 536. We thus hold that the offense is categorically a crime of violence and a proper predicate for the Defendants' § 924(c) convictions.

## C.    *None of the Defendants' Other Arguments Justify Reversal*

### 1.    *Motions to Sever the Trial*

The next argument raised by the Defendants is that the district court abused its discretion in allowing a joint trial. They argue first that they presented mutually antagonistic defenses. Mencher's attorney, for example, argued at trial that Cosimano "set [Mencher] up to take the fall for the killing." Second, the

Defendants argue that the joint trial allowed the government to admit damaging evidence that would otherwise have been inadmissible. Specifically, Mencher zeroes in on evidence of the Costa shooting. If Mencher had been tried separately, he says, the jury never would have heard about that incident because it took place before he joined the 69'ers and he played no role in that shooting. Cosimano, for his part, argues that evidence of Mencher's drug dealing, based on Mencher's own statements, was admissible only under the statement-of-a-party-opponent hearsay exception. That evidence would have been inadmissible had Cosimano been tried separately.

The government responds that mutually antagonistic defenses are not necessarily prejudicial. As to spillover evidence, the government says any prejudice was ameliorated by the district court's limiting instruction that the jury should consider the evidence as to each defendant and each count separately.

We review the denial of a motion to sever for abuse of discretion. *United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002). Generally, a joint trial is preferred when defendants are indicted together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). District courts should grant a severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. "Mutually antagonistic defenses," however, "are not prejudicial *per se*." *Id.* at 538. In fact, "the best solution in such situations," generally, "is not severance,

but for the trial judge to issue proper limiting instructions." *United States v. Blankenship*, 382 F.3d 1110, 1125 n.27 (11th Cir. 2004). We've offered the caveat that a limiting instruction may be insufficient in a scenario where "the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." *Id.* at 1124.

Here, it is true that the joint trial had some spillover effect. Evidence of the Costa shooting may not have been otherwise admissible against Mencher, and evidence of Mencher's drug dealing may not have been otherwise admissible against Cosimano. But the evidence was not so voluminous that it would have been "nearly impossible" for the jury to sort through and to determine guilt as to each defendant on each charge. *See id.* As a result, the district judge's decision to give a limiting instruction rather than sever the trial was not an abuse of discretion. *See Zafiro*, 506 U.S. at 539. We thus affirm.

  2.    *Motion to Suppress Cosimano's Post-Miranda Statement*

Cosimano's final argument is that the district court erred in denying his motion to suppress statements he made during a custodial interrogation. He argues that the agent improperly downplayed the *Miranda* warnings,[4] rendering them meaningless—

_____

[4] Cosimano also argues that his rights were violated under *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (holding that once a defendant has

22                    Opinion of the Court                    19-14841

particularly given Cosimano's fragile emotional state at the time.

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its application of the law de novo. *United States v. Watkins*, 760 F.3d 1271, 1282 (11th Cir. 2014). A defendant may waive his right to remain silent, but the waiver must be voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Police are not to give *Miranda* warnings in a manner that is coercive or misleading. *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991). A *Miranda* waiver is effective "if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (internal quotation marks omitted).

Cosimano relies heavily on our decision in *Beale*, where we found *Miranda* warnings to be misleading because an investigator told a defendant that waiving his rights "would not hurt him." *Beale*, 921 F.2d at 1435. That promise, we held, contradicted the warning that the defendant's statements could be used against him in court. *Id.*; *see also Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 894–95 (11th Cir. 2003) (finding *Miranda* warnings misleading

---

"expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him"). Since Cosimano did not request to have counsel present while he was questioned, *Edwards* does not help him. We thus analyze his claim under *Miranda*.

where a defendant was promised that honesty would not hurt him).

This case, however, is distinguishable from *Beale* and *Hart*. True, the agent told Cosimano that honesty could "help" him and put him "in the best possible position." But the agent made no promises. To the contrary, the agent told Cosimano: "I'm not making you any promises, okay? I literally, I cannot do it." And although Cosimano may have been in an emotionally vulnerable state during the interview, the district court found that he "was well-aware of what he was signing." Because the record does not establish that this finding was clearly erroneous, we affirm.

### 3.    *Motion for New Trial Because of Juror Misconduct*

Mencher's final argument is that the district court should have declared a mistrial based on juror misconduct.

We review for abuse of discretion a district court's denial of a motion for mistrial based on the jury's exposure to extrinsic information. *United States v. Dortch*, 696 F.3d 1104, 1110 (11th Cir. 2012). A mistrial is required only if the extrinsic evidence posed a reasonable possibility of prejudice to the defendant. *Id.* The government has the burden to show that any exposure to extrinsic evidence was harmless. *Id.* Factors relevant to this determination include: "(1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the

juror issues; and (4) the strength of the government's case." *United States v. Ronda*, 455 F.3d 1273, 1300 (11th Cir. 2006).

To be sure, it was improper for Juror 3 to research the law himself and share his findings with his fellow jurors. But, importantly, each of the jurors assured the court that he or she would follow the law and the court's instructions. Based on the court's interview with the jurors, any exposure to extrinsic evidence was harmless. It did not appear that the jurors took to heart what they heard from Juror 3—much less that it would have prevented them from fulfilling their oaths. Therefore, the district court's decision to replace the wayward juror rather than declare a mistrial was not an abuse of discretion.

### III.    CONCLUSION

In summary, sufficient evidence supports the jury's verdict, and none of the trial errors alleged by the Defendants warrants reversal. We thus affirm.

**AFFIRMED.**